UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

MICHAEL D. MCGRANAHAN, Chapter
7 Trustee,

                                    NO. CIV. S:07-65 FCD KJM
        Plaintiff,

    v.                              MEMORANDUM AND ORDER

THE INSURANCE CORPORATION OF
NEW YORK,

        Defendant.

----oo0oo----

    Plaintiff Michael D. McGranahan ("McGranahan" or
"plaintiff") brings this action against defendant The Insurance
Corporation of New York ("INSCORP" or "defendant") for breach of
the duty to defend, breach of the duty to indemnify, breach of
the covenant of good faith and fair dealing, and declaratory
relief.[1]  Plaintiff moves for partial summary judgment on his
claims for breach of the duty to defend and breach of the duty to
indemnify.  Defendant moves for summary judgment on all of

---

    [1]  Because oral argument will not be of material
assistance, the court orders these matters submitted on the
briefs.  E.D. Cal. L.R. 78-230(h).

1

plaintiff's claims.  For the reasons set for below, plaintiff's motion is GRANTED in part and DENIED in part, and defendant's motion is DENIED.

BACKGROUND[2]

### A.   The Insurance Policy

INSCORP issued a Commercial General Liability policy (the "policy") to Jeff Stewart Drywall, Inc. ("JSD") effective August 1, 1997.  (DRUF ¶ 1.)[3]  JSD renewed the policy each year such that it was effective between August 1, 2002, and August 1, 2003. (PRUF ¶ 1.)

The policy provided that INSCORP would defend and indemnify JSD against any suit seeking damages for property damage caused by an "occurrence."  (PRUF ¶ 2.)  The policy defined an occurrence as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." (PRUF ¶ 3.)

The policy also contained a number of exclusions from coverage.  First, the policy excluded coverage for property damage "expected or intended from the standpoint of the insured." (PRUF ¶ 5.)  Second, the policy excluded coverage for property

---

[2]   Unless otherwise noted, the facts recited herein are undisputed.  (Def.'s Resp. to Pl.'s Stmt. of Undisputed Facts ("DRUF"), filed Jan. 25, 2008; Pl.'s Resp. to Def.'s Stmt. of Undisputed Facts ("PRUF"), filed Jan. 25, 2008.)  Where the facts are disputed, the court recounts both parties versions of the facts.  (Pl.'s Stmt. of Undisputed Facts ("PUF"), filed Jan. 11, 2008; Def.'s Stmt. of Undisputed Facts ("DUF"), filed Jan. 12, 2008.)

[3]   The court notes that INSCORP filed various objections to plaintiff's evidence.  Except as noted herein, the court finds INSCORP's objections irrelevant to the motion, as the court does not rely upon the subject evidence in rendering its decision, or otherwise without merit.

damage to the insured's work and work product.  (PRUF ¶ 6.)
Specifically, the policy excluded property damage to "that
particular part of the real property" on which the insured worked
and "that particular part of the property that must be restored,
repaired or replaced" because the insured incorrectly performed
work on it.  (PRUF ¶ 6.)

   **B.   The Wisteria Project**

     On or about May 16, 2002, JSD entered into a subcontract
with Dunmore Homes ("Dunmore") for the installation of drywall at
the Wisteria subdivision in Ceres, California.  (PRUF ¶ 7.)  JSD
installed drywall in homes in the Wisteria subdivision between
December 2002 and January 2003.  (DRUF ¶ 9.)  During this time,
the weather in Ceres was frequently cold, damp, and foggy, with
occasional drizzling rain.  (DRUF ¶ 9.)

     JSD alleges that the drywall was delivered to each home site
where it was stacked and covered with a plastic tarp until
installation.  (PUF ¶ 10.)  JSD maintains that before it could
install the drywall in several homes, some of the sheets of
drywall became wet.  (PUF ¶ 10.)  JSD asserts that it culled or
replaced these sheets with additional drywall.  (PUF ¶ 10.)

     After the drywall was installed, JSD's work was inspected
and approved.  (DRUF ¶ 11.)  Thereafter, mold was identified on
some of the drywall installed in some of the homes.  (DRUF ¶ 12.)
With the approval of Andy Chipponeri ("Chipponeri"), the General
Superintendent for the Wisteria subdivision, JSD attempted to
repair the damage by treating the moldy drywall with bleach.
(DRUF ¶ 12.)

On April 9, 2003, Dunmore directed a letter to JSD and the Insurance Center of Central California, alleging JSD breached the contract:

> Dunmore has received claims that nearly a dozen homes involved in the project may have sustained mold damage because sheet rock hung in those homes by [JSD] may have had visible mold on the sheet rock at the time of installation.

(PRUF ¶¶ 9-10.)

On October 23, 2004, INSCORP's claim adjuster, Neville Duvall ("Duvall"), contacted counsel for Dunmore Homes, Larry Wengel ("Wengel"), about the allegations.  (PRUF ¶ 12.)  In his claims file notes, Duvall wrote:

> Of the many things discussed "sudden and accidental" is not the understanding of what took place.  It appears the allegations facing the insure[d] are that the insured hung rock that had been lying around open in the rain and statements to the effect of when some of the panels where [sic] hung they were previously exposed to damp mold covered corners and the ones that were acknowledged to have mold growing were wiped down with water and bleach and then hung in place to dry out[.]

(PRUF ¶ 12.)

Dunmore subsequently provided JSD and INSCORP with reports from the Environmental Consultants Group ("ECG") describing the results of testing performed on homes in the subdivision.  (DRUF ¶ 3.)  The ECG reported:

> Prior to hanging the drywall had been stored in bulk inside the building as is common in new construction. Unfortunately, a storm moved the plastic tarps off the drywall stacks.  Rain reached a portion of the drywall, and ultimately, a large portion of the drywall formed mold.  The worst of the drywall was culled, but the vast majority was used.  Mold growth was present on many of the drywall panels.  In response, the exposed surface of all walls and ceilings were sprayed with bleach prior to texturing and painting.

4

(PRUF ¶ 13.)  For homes contaminated with mold, the ECG recommended that a mold remediation firm remove the drywall; remove and clean fixtures, such as cabinets, tubs, toilets, and light fixtures; remove exposed insulation; clean HVAC duct work; and clean residual traces of the mold from the structure, including traces on floors, walls, ceiling, and ledges.  (Def.'s Ex. F, filed Jan. 12, 2008.)

### C.   The Arbitration

On or about August 27, 2003, Dunmore initiated binding arbitration proceedings against JSD, alleging a single claim for breach of contract:

> [JSD] utilized mold-contaminated sheet rock in multiple homes in the Wisteria subdivison, Ceres, California, in performance of its Subcontract Agreement with Dunmore Homes, LLC.  Dunmore has had to test the homes in question and remove and remediate mold contamination in multiple homes, to its damage.  The performance of [JSD] was in breach of the Subcontract Agreement obligations of [JSD], and has proximately damaged Dunmore Homes, LLC.

(PRUF ¶¶ 14-15.)  INSCORP denied coverage for this claim against JSD on January 2, 2004.  (PRUF ¶ 17.)  On January 19, 2004, JSD answered Dunmore's Demand for Arbitration, asserting a counterclaim and several affirmative defenses.  (PRUF ¶ 16.)

On February 23, 2004, counsel for JSD, Larry Niermeyer ("Niermeyer") wrote INSCORP's claim adjuster, HDR Insurance Services, and asked if it would reconsider coverage if he submitted affidavits and receipts for the purchase of replacement drywall.  (PRUF ¶ 18.)  The letter stated that "Mr. Stewart has always maintained that he never used and/or installed drywall that was contaminated with mold, damaged, or deteriorated."  (Def.'s Ex. J, filed Jan. 12, 2008.)  JSD faxed receipts for the

replacement drywall and the Declaration of Chipponeri to
INSCORP's claims adjuster on February 25, 2004.  (PRUF ¶ 19.)

In his declaration, Chipponeri stated, "At no time did I
ever see [JSD] install and/or use drywall on the Wisteria
Development that was contaminated with mold, damaged or
deteriorated in any manner."  (Def.'s Ex. J.)  Chipponeri also
denied ever seeing any evidence that suggested JSD was installing
moldy, damaged, or deteriorated drywall.  (Def.'s Ex. J.)
However, Chipponeri noted "the presence of mold on a select few
sheets of drywall was brought to my attention."  (Def.'s Ex. J.)
He attributed the mold to the fact "the home in which [the
drywall] was located was not moisture secure."  (Def.'s Ex. J.)
Chipponeri admitted approving the treatment of these sheets of
drywall with bleach.  (Def.'s Ex. J.)

The arbitration between Dunmore and JSD occurred in March of
2004.  (PRUF ¶ 21.)  The arbitrator found that JSD was on notice
of the mold problem when it received a letter dated February 13,
2003, from a homeowner, indicating she observed mold on the
drywall while it was stacked as well as after it was installed.
(PRUF ¶ 25.)  The arbitrator determined that the decision
thereafter to apply bleach to the moldy drywall was insufficient,
which "should have been apparent to both [Dunmore] and [JSD]."
(PRUF ¶¶ 26-27.)  The arbitrator awarded Dunmore damages in the
amount of $183,646.85.[4]  (PRUF ¶ 29.)  Judgment in this amount

_____

[4]     The arbitrator found JSD liable for damages totaling
$350,584.68.  (Def.'s Ex. L, filed Jan. 12, 2008.)  However, the
arbitrator reduced this award to $131,710 based on Dunmore's
withholding of money due JSD under the contract.  (Def.'s Ex. L.)
The arbitrator then added fees and costs for a total award to
Dunmore of $183,646.85.  (Def.'s Ex. L.)

1   was entered against JSD on or about July 27, 2004.  (PRUF ¶ 29.)

2       **D.   The Instant Action**

3       In April 2005, JSD filed for bankrupcy under Chapter 7 of
4   the United State Bankruptcy Code in the United States Bankruptcy
5   Court for the Eastern District of California.  Thereafter,
6   McGranahan was appointed Chapter 7 Trustee for the bankruptcy
7   estate of JSD.  McGranahan filed a complaint against INSCORP on
8   April 10, 2006, for breach of the duty to defend, breach of the
9   duty to indemnify, declaratory relief, and breach of the implied
10  covenant of good faith and fair dealing.

11      On January 10, 2007, McGranahan moved to withdraw the
12  proceedings before the bankcruptcy court.  The motion was granted
13  on February 2, 2007, and the case was transferred to this court.
14  Both McGranahan and INSCORP now move for summary judgment.

15                          **STANDARD**

16      Summary judgment is appropriate when it is demonstrated that
17  there exists no genuine issue as to any material fact, and that
18  the moving party is entitled to judgment as a matter of law.
19  Fed. R. Civ. P. 56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144,
20  157 (1970).

21      When parties submit cross-motions for summary judgment, the
22  court must review the evidence submitted in support of *each*
23  cross-motion and consider each party's motion on its own merits.
24  <u>Fair Housing Council of Riverside County, Inc. v. Riverside Two</u>,
25  249 F.3d 1132, 1136 (9th Cir. 2001).  The court must examine each
26  set of evidence in the light most favorable to the non-moving
27  party.  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

28

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986); First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968). Genuine factual issues must exist that "can be resolved only by a finder of fact, because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987) (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See Falls Riverway Realty, Inc. v. City of Niagara Falls, 754 F.2d 49, 57 (2d Cir. 1985); Thornhill Publ'g Co., Inc. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979).

8

1

**ANALYSIS**[5]

2

**A.   Duty to Defend**

3 A liability insurer owes a broad duty to defend its insured
4 against a claim that "*potentially* seeks damages within the
5 coverage of the insurance policy." Horace Mann Ins. Co. v.
6 Barbara B., 4 Cal. 4th 1076, 1081 (1993) (citing Gray v. Zurich
7 Ins. Co., 65 Cal. 2d 263, 275 (1966)) (emphasis in original).
8 Implicit in this rule is the principle that a duty may exist
9 "even where coverage is in doubt and ultimately does not
10 develop." Montrose Chem. Corp. Of Cal. v. Super. Ct., 6 Cal. 4th
11 287, 295 (1993) (citation omitted).

12 The insured bears the initial burden of showing a potential
13 for coverage, while the insurer must prove the absence of any
14 such potential. Id. at 300. The insurer's duty is determined by
15 comparing the allegations in the complaint with the terms of the
16 policy. Horace, 4 Cal. 4th at 1081. A duty to defend may also
17 exist if facts extrinsic to the complaint give rise to a
18 possibility that the claim may be covered by the policy. Id.

19 The duty to defend continues until the underlying lawsuit is
20 concluded or until it has been shown that there is no potential
21 for coverage. Montrose, 6 Cal. 4th at 295. Any doubt as to
22 whether the insurer has a duty to defend is resolved in the
23 insured's favor. Horace, 4 Cal. 4th at 1081. Facts merely
24 tending to show a claim is not covered will not defeat the
25 insurer's duty to defend. Montrose, 6 Cal. 4th at 300.

26

27
28
[5]   All further references to the parties are to "JSD" and
"INSCORP," with the understanding that McGranahan is acting as
trustee for JSD's estate.

9

**1. Coverage for "occurrence"**

JSD contends that the breach of contract claim filed by Dunmore was at least potentially covered by the INSCORP insurance policy because the mold contamination resulted from an accident. Conversely, INSCORP argues that there was no potential for coverage under the policy because JSD intentionally installed wet/moldy drywall.

An insurer has a duty to defend where a factual dispute exists over the scope of coverage. <u>Montrose Chem. Corp. of Cal. v. Super. Ct.</u>, 6 Cal. 4th 287 (1993).[6] In <u>Montrose</u>, a pesticide manufacturer sued his insurance company seeking a declaration that the insurer had a duty to defend in an underlying CERCLA action. <u>Id.</u> at 292. The CERCLA complaint alleged that the manufacturer's operation of its facility caused environmental contamination. <u>Id.</u> In opposing the manufacturer's motion for summary judgment, the insurer argued that extrinsic evidence "raised a triable issue of fact" as to whether the manufacturer had intentionally caused the contamination, and, thus, it had no duty to defend. <u>Id.</u> at 294. The California Supreme Court held that a factual dispute as to the scope of coverage could not defeat the potential for coverage and eliminate the duty to

---

[6]    INSCORP contends the present action sounds in contract not tort; therefore, reliance on tort cases is inappropriate. However, the California Supreme Court has expressly refused to draw a distinction between contract actions and tort actions for purposes of determining the scope of insurance coverage. <u>See</u> <u>Vandenberg v. Super. Ct.</u>, 21 Cal. 4th 815, 840 (1999) ("[T]he arbitrariness of the distinction between contract and tort . . . is evident when we consider the same act may constitute both a breach of contract and a tort. Predicating coverage upon an injured party's choice of remedy or the form of action sought is not the law in this state.") (citation omitted).

defend.  Id. at 304.  The court reasoned that the "neutral"

allegations of the CERCLA complaint "sufficed to raise the

possibility that [the manufacturer] would be liable for property

damage covered by the policies."  Id.  Extrinsic evidence that

disputed the manufacturer's conduct was negligent "did not

eliminate that possibility."  Id.  Therefore, the insurer had a

duty to defend the manufacturer in the underlying CERCLA action.

Id.

        The facts in Montrose are analogous to the facts of this

case.  The underlying arbitration complaint alleged that JSD

"utilized mold-contaminated sheet rock" in the homes of the

Wisteria subdivision.  (PRUF ¶ 15.)  The complaint did not

indicate whether JSD intentionally or negligently utilized the

mold-contaminated sheet rock.  (PRUF ¶ 15.)  The complaint is

thus like the "neutral" complaint that gave rise to a duty to

defend in Montrose.  The potential for coverage exists in both

cases because the terms of the policies cover "accidents."

        INSCORP asserts that there was sufficient evidence to

suggest that JSD had intentionally installed wet or moldy drywall

and thus eliminate the potential for coverage.[7]  Wengel told an

---

[7]    INSCORP asserts the arbitrator determined JSD was aware
the sheet rock was wet or moldy prior to installation.  This
misstates the arbitrator's award.  (Def.'s Ex. L ("Whether the
sheetrock was wet or moist before hanging, even though visible
signs of mold might not be present, does not really matter. . . .
[U]nder the terms of the contract, [JSD] is responsible for
mold on the sheetrock.").)  Even if the arbitrator had determined
JSD was aware of the mold, INSCORP cannot rely on the
arbitrator's award to support its refusal to defend JSD.
Montrose, 6 Cal. 4th at 295 ("For an insurer, the duty to defend
turns not upon the ultimate adjudication of coverage under its
policy, but upon those facts known by the insurer at the
inception of the third party lawsuit.").

11

1  INSCORP claim adjuster that Dunmore's understanding of the case

2  was that JSD installed wet and moldy drywall.  (PRUF ¶ 12.)

3  Chipponeri also admitted that mold growth was brought to his

4  attention in at least one of the homes after installation.

5  (Def.'s Ex. J.)  In addition, one homeowner in the Wisteria

6  subdivision observed mold on the drywall while it was stacked and

7  after it was hung.[8]  (PRUF ¶ 25.)  As set forth by the California

8  Supreme Court in <u>Montrose</u>, however, these factual issues "merely

9  place[] in dispute whether [the insured's] actions [will]

10  eventually be determined not to constitute an occurrence or to

11  fall within one or more of the exclusions contained in the

12  polic[y]."  6 Cal. 4th at 304.  So long as the possibility of a

13  judgement based on non-intentional conduct existed, there was a

14  potential for coverage giving rise to INSCORP's duty to defend.

15      The extrinsic evidence known to INSCORP from the time it was

16  first notified of the claim until the time of arbitration did not

17  definitively eliminate the possibility of coverage.  Any

18  inference that JSD had intentionally installed moldy drywall was

19  firmly opposed by the letter sent from Niermeyer, JSD's counsel,

20  to INSCORP's claim adjuster prior to arbitration.  The letter

21  expressly stated, "Mr. Stewart has always maintained that he

22  never used and/or installed drywall that was contaminated with

23  mold, damaged, or deteriorated."  (Def.'s Ex. J.)  The attached

24  ─────────────────

25      [8]    It is unclear from the parties' submissions whether
    INSCORP was aware of this fact prior to the arbitrator's award.
26  <u>See</u> <u>Montrose</u>, 6 Cal. 4th at 295 ("For an insurer, the duty to
    defend turns not upon the ultimate adjudication of coverage under
    its policy, but upon those facts known by the insurer at the
27  inception of the third party lawsuit.").  Consideration of this
    fact, however, does not prejudice plaintiff as it is not
28  sufficient to eliminate the potential for coverage.

Chipponeri declaration appeared to confirm this assertion by denying any evidence of moldy, damaged, or deteriorated drywall installation in the Wisteria subdivision.  (Def.'s Ex. J.)  Thus, the undisputed facts demonstrate that there was a potential for coverage under the policy and that INSCORP had a duty to defend JSD in the underlying arbitration.

INSCORP relies on <u>Merced Mutual Insurance Company v. Mendez</u>, 213 Cal. App. 3d 41 (1989), to argue that no potential for liability existed because deliberate acts, despite their unintentional harm, can never qualify as "accidental." Defendant's reliance is misplaced.  The principles set forth in <u>Merced Mutual</u> support the court's holding that there was the potential for coverage.  The <u>Merced Mutual</u> court provided an example of the distinction between intentional and negligent conduct:

> When a driver intentionally speeds and, as a result, negligently hits another car, the speeding would be an intentional act.  However, the act directly responsible for the injury--hitting the other car--was not intended by the driver and was fortuitous.  Accordingly, the occurrence resulting in injury would be deemed an accident.  On the other hand, where the driver was speeding and deliberately hit the other car, the act directly responsible for the injury--hitting the other car--would be intentional and any resulting injury would be directly caused by the driver's intentional act.

<u>Id.</u>

Applying these principles to this case, the question is not whether JSD intended to hang sheet rock.  Rather, the question is whether JSD intended the cause of the damage to the Wisteria homes, that is, the hanging of wet or moldy sheet rock.  As set forth above, the allegations and extrinsic evidence on this point

13

are conflicting, giving rise to a duty to defend on the part of INSCORP until it was either determined that no potential for liability existed or the arbitration reached a conclusion.[9]

## 2. Exclusion for "your work"

INSCORP also argues no potential for coverage existed because the damage to the homes in the Wisteria subdivision fell within the "your work"[10] exclusion for damage to "that particular part of the property" on which JSD worked. (PRUF ¶ 6.) JSD does not dispute the policy excluded coverage for damage to the drywall. (See Pl.'s P. & A. in Supp. of Mot. for Partial Summ. J. ("Pl's P. & A.") 11:13-17, filed Jan. 11, 2008.) However, JSD contends that Dunmore sought damages not just for the drywall itself, but also for other parts of the property damaged by the drywall. (Pl.'s P. & A. 12:6-8.)

The California Court of Appeal has narrowly construed "your work" exclusions in insurance policies. Roger H. Proulx & Co. v. Crest-Liner, Inc., 98 Cal. App. 4th 182 (2002). In Crest-Liner, the insured had negligently installed a waterproof liner for an air conditioning tank. Id. at 189. The insurer moved for

---

[9] INSCORP's reliance on Ray v. Valley Forge Insurance Company, 77 Cal. App. 4th 1039 (1999), is similarly unpersuasive. In Ray, the court held a roofing consultant's advice to install unsuitable materials was not an accident merely because the consultant did not intend the resulting harm. Id. at 1046. The court reasoned the consultant intended to give professional advice and intended his client to use the materials he recommended. Id. In contrast, while JSD clearly intended to install the drywall, the evidence is conflicting regarding whether JSD intended to install wet or moldy drywall. Thus, unlike in Ray, JSD's conduct is not clearly outside the scope of the insurance policy.

[10] "Your work" refers to "[w]ork or operations performed by [the insured]" and "[m]aterials, parts or equipment furnished in connection with such work or operations." (PRUF ¶ 6.)

14

summary judgment on the grounds that the alleged property damage

fell within an exclusion for property damage to "[t]hat

particular part of real property on which [the insured] . . .

[is] performing operation if the 'property damage' arises out of

those operations." Id. at 202.  The court concluded that the

exclusion could not form the basis for summary judgment because

the insurer failed to show all of the damage suffered was to the

tank liner. Id. at 202-03.  In fact, "the evidence before the

trial court indicated that at least some of the damage at issue

involved property other than the tank liner[.]" Id. at 203.

    The evidence before the court indicates that some of the

damage alleged by Dunmore was to property other than the drywall

in the Wisteria homes.  (See Pl.'s Ex. E, filed Jan. 11, 2008;

Def.'s Ex. F.)  For example, the ECG reports recommend mold

remediation work to the cabinets, light fixtures, floors, tubs,

and ceilings, among others.  (Def.'s Ex. F.)  JSD has also

proffered alleged receipts for the work, indicating damages to

portions of the homes other than the drywall.[11]  (Pl.'s Ex. E.)

    Further, INSCORP has provided no evidence to show that all

of the damage Dunmore sought to recover was to the "particular

part of the property" on which JSD performed work.  It is

INSCORP's burden to show that a policy exclusion applies.  Absent

---

[11]    INSCORP objects to this evidence on the grounds that it
is irrelevant, lacks foundation, and reflects estimates of the
damage as opposed to receipts.  The evidence is relevant to
determining whether the "your work" policy exclusion applies.  If
all the damages sought by Dunmore were for damage to the drywall
alone, JSD concedes that it would have no claim for defense or
indemnity.  Whether the documents are characterized receipts or
estimates, they are evidence that Dunmore's damages included
damage to property other than the drywall.

production of evidence to support its assertion, and in the face of evidence to the contrary, the court cannot grant summary judgment in favor of INSCORP.  INSCORP failed to demonstrate that there is no potential for coverage such that it had no duty to defend JSD in the arbitration.

### 3.   Exclusion for work not completed

Finally, INSCORP argues that no potential for coverage existed because the policy expired before JSD "completed" the work.  It is undisputed that JSD's work passed inspection sometime between January and February of 2003.  (DRUF ¶¶ 11-12.) It is also undisputed that homeowners were unable to move into the Wisteria subdivision until remediation was completed on August 21, 2003. (PRUF ¶ 28.)  Thus, INSCORP raises an issue of interpretation as to whether the work was "completed" before the policy expired on August 1, 2003.[12]

The interpretation of an insurance policy presents a question of law for this court to decide.[13]  <u>Waller v. Truck Ins. Exchange, Inc.</u>, 11 Cal. 4th 1, 18-19 (1995).  The court

---

[12]   INSCORP argues the arbitrator in the underlying action found the "homes were not 'completed' until August 21, 2003." This misstates the arbitrator's award.  The arbitrator found that "remediation was performed and on August 21, 2003, ECG confirmed that the mold had been removed."  (Award of Arbitration, Def.'s Ex. L, at 3.)  The arbitrator did not make a determination of whether JSD's work was completed on that date for purposes of coverage under the policy.  (Def.'s Ex. L.)

[13]   In its reply to INSCORP's Response to Plaintiff's Statement of Undisputed Facts, JSD concedes that it had not completed its contractual obligations when the drywall passed inspection.  This concession, however, does not affect the court's analysis because the interpretation of an insurance contract is a question of law for the court to decide.  Further, it is unclear whether JSD's concession refers to completion of the project for purposes of the insurance policy or for purposes of the contract with Dunmore.

interprets the words used in the policy according to the plain
meaning an ordinary person would ascribe to them.  Id. at 18.

In this case, the policy excludes coverage for "that
particular part of the property that must be restored, repaired
or replaced because 'your work' was incorrectly performed on it."
(PRUF ¶ 6.) "Your work" refers to the materials supplied and
operations performed by the insured.  (PRUF ¶ 6.)  The policy
sets forth an exception to this exclusion, however, for "all
'property damage' occurring away from premises you own or rent
and arising out of 'your product'[14] or 'your work.'" (PRUF ¶ 6.)
This exception only applies to work that has been completed.
Work is deemed completed at the "earliest" of "[w]hen all the
work called for in [the] contract has been completed" or "[w]hen
that part of the work done at a job site has been put to its
intended use by any person or organization other than another
contractor or subcontractor working on the same project."  (PRUF
¶ 6.)  "Work that may need service, maintenance, correction,
repair or replacement, but which is otherwise complete, will be
treated as completed."  (PRUF ¶ 6.)

Reading these provisions in conjunction, and giving them
their plain meaning, the policy permits coverage for all property
damage arising out of the insured's work (except for the part of
the property on which the insured performed work) if the work was
completed.  Work is completed at the *earliest* of either finishing

---

[14]   "Your product" refers to "[a]ny goods or products . . .
manufactured, sold, handled, distributed or disposed of by [the
insured" and "[c]ontainers (other than vehicles), materials,
parts or equipment furnished in connection with such goods or
products."  (Def.'s Ex. A, filed Jan. 12, 2008.)

all the work required by the contract or when the property on
which the insured worked is put to its intended use.  Work that
is otherwise complete is not deemed incomplete merely because it
requires correction or replacement.

Applying this interpretation to the undisputed facts, the
court holds that the policy covers damage to portions of the
Wisteria homes other than the drywall because JSD had completed
all the work required by the contract once the drywall was
inspected and approved by Dunmore homes in January or February
2003.  While INSCORP argues that the work was not "completed"
until the homes were put to their intended use in August 2003,
the policy clearly deems work completed if all the work required
under the contract is finished prior to that time.  The fact that
JSD later returned to the job site to remediate the mold does not
alter the analysis.  As INSCORP states in its brief, JSD took
such measures to "remediate and correct the problem" after
January/February 2003.  (Def.'s P. & A. 20:4.)  Work requiring
correction or replacement is still deemed "completed" under the
terms of the policy.  Therefore, JSD's claim is not subject to
the exclusion for work not completed.

Thus, because the undisputed facts demonstrate that there
was the potential for coverage under the policy, and because
defendant cannot demonstrate that an exclusion to coverage
applies as a matter of law, defendant's motion for summary
judgment regarding plaintiff's claim for breach of the duty to
defend is DENIED, and plaintiff's motion for summary judgment is

18

GRANTED.[15]

**B.  <u>Duty to Indemnify</u>**[16]

Unlike the duty to defend, a liability insurer owes a duty to indemnify only where a judgment has been entered against the insured on a claim that is actually covered by the policy.  <u>Buss v. Super. Ct.</u>, 16 Cal. 4th 35, 45-46 (1997).  An insurer that is notified of an action and refuses to defend is bound by the judgment in the action as to all material findings of fact essential to the judgment.  <u>Geddes & Smith, Inc. v. Saint Paul Mercury Indem. Co.</u>, 51 Cal. 2d 558, 561 (1959).  However, an insurer is not bound by issues not adjudicated in the prior action and can present defenses to the extent they are consistent with the judgment against the insured.  <u>Id.</u> at 561-62.

There is no dispute among the parties that the arbitrator did not address whether JSD intentionally installed moldy drywall.  (DRUF ¶ 15.)  Therefore, INSCORP is not bound by any findings of fact or determinations of law with respect to the scope of insurance coverage.

INSCORP denies owing JSD a duty to indemnify on the grounds that (1) the installation of the drywall was not an "occurrence"

---

[15]    The parties dispute JSD's damages for breach of the duty to defend.  JSD claims it sufferd $39,482.62 in defense costs to defend the arbitration.  (PUF ¶ 16.)  INSCORP asserts the bills provided by JSD include other matters, including Jeff Stewart's divorce.    (DRUF ¶ 16.)   This dispute cannot be resolved on a motion for summary judgment and is therefore reserved for resolution at trial.

[16]    INSCORP argues that JSD's claim for breach of the duty to indemnify is unfounded because INSCORP paid the arbitration judgment rendered against JSD.  However, INSCORP proffers no evidence to support this assertion.  As the moving party, INSCORP bears the initial burden of showing summary judgment is appropriate.  INSCORP has not met its burden.

within the terms of the policy; and (2) the policy exclusion for "your work" applies to the damages sought by Dunmore in arbitration.[17]   As set forth above, there are triable issues of fact regarding whether JSD's conduct fell within the scope of policy coverage.  JSD argues that it never intentionally installed wet or moldy drywall, as demonstrated by the neutral Demand for Arbitration and Niermeyer's letter to INSCORP's claims adjuster.  INSCORP contends that Wengel informed its claims adjuster that JSD had intentionally installed moldy drywall, Chipponeri admitted that mold growth was brought to attention in at least one home, and a homeowner wrote JSD indicating she observed mold on the drywall both before and after installation. Based upon the conflicting evidence provided by the parties, this issue cannot be resolved on summary judgment.  Moreover, as set for above, INSCORP has failed to meet its burden of establishing that the "your work" exception covered all the damages sought by Dunmore in the underlying arbitration.

Because triable issues of fact exist regarding whether JSD acted with intent in installing drywall exposed to mold, and whether an exception covered all damages in the arbitration, both plaintiff's and defendant's motion for summary judgment as to this claim are DENIED.

**C.   Bad Faith**

INSCORP moves for summary judgment on JSD's claim for breach of the implied covenant of good faith and fair dealing on the

---

[17]   INSCORP also contends that JSD did not "complete" the work for purposes of coverage under the policy.  As set forth above, the court holds that the work was completed for purposes of policy coverage in January or February 2003.

grounds that it is barred by a two-year statute of limitations. INSCORP asserts the statute of limitations began running on January 2, 2004, when INSCORP denied JSD's claim for defense, and thus because this action was filed on April 10, 2006, the claim is barred.  The court disagrees.

The statute of limitations for a breach of the duty to defend a claim is equitably tolled until final judgment.  <u>Lambert v. Commonwealth Land Title Ins. Co.</u>, 53 Cal. 3d 1072, 1080 (1991).  In <u>Lambert</u>, an insured sued his title insurer after it denied coverage and refused to defend the insured in an underlying suit.  53 Cal. 3d at 1075.  The court held that the plaintiff's suit was not barred by the two-year statute of limitations.  <u>Id.</u> at 1080.  The court reasoned that "[b]ecause the underlying litigation may take over two years, . . . the statute of limitations on a lawsuit to vindicate the duty to defend [would run] even before the duty to defend itself expires."  <u>Id.</u> at 1077.  The court stated that where a continuing duty is breached, the plaintiff "must be allowed the *option*" of filing suit when the time for complete performance has passed. <u>Id.</u>

Similarly, in <u>Archdale v. American International Specialty Lines Insurance Company</u>, 154 Cal. App. 4th 449 (2007), a tort claimant filed suit against a tortfeasor's insurer for breach of the implied covenant of good faith and fair dealing.  154 Cal. App. 4th at 458.  The insurer had refused to accept a reasonable settlement offer in an underlying personal injury lawsuit.  <u>Id.</u> at 458-59.  Relying on <u>Lambert</u>, the Court of Appeal held that the statute of limitations was tolled until final judgment was

21

1  entered.   The court reasoned that while the insured's cause of

2  action may have accrued when the insurer refused the settlement

3  offer, the resulting damages could not be certain until the

4  judgment was final.   <u>Id.</u> at 478.

5      The court holds that the two-year statute of limitations for

6  JSD's claim for bad faith and fair dealing was equitably tolled

7  until entry of final judgment.   JSD's claim for bad faith rests

8  in part on INSCORP's wrongful breach of its duty to defend JSD in

9  the underlying arbitration.   As noted above, the duty to defend

10 continues until the underlying suit is concluded or the potential

11 for coverage is eliminated.   A cause of action thus accrued not

12 only upon INSCORP's initial refusal to defend JSD, but also each

13 day INSCORP continued to refuse to defend JSD.   In such

14 circumstances, it is illogical and inequitable to require JSD to

15 file an action for bad faith against INSCORP in the midst of

16 litigating the underlying judgment that will serve as the basis

17 for its claim of damages.

18     To the extent JSD's claim for bad faith is premised on

19 breach of the duty to indemnify, INSCORP may have denied coverage

20 in January 2004, but breach of the duty did not occur until final

21 judgment was entered in July 2004.   <u>See Certain Underwriters at</u>

22 <u>Lloyd's of London v. Super. Ct.</u>, 24 Cal. 4th 945, 958 (2001)

23 ("[T]he duty to indemnify can arise only after damages are fixed

24 in their amount[.]").)   Therefore, plaintiff's claim for bad

25 faith premised upon breach of that duty also did not occur until

26 July 2004.

27     Based on the foregoing, INSCORP's motion for summary

28 judgment on this claim is DENIED.

**CONCLUSION**

1.  Regarding plaintiff's claim for breach of the duty to defend:

    A.  Plaintiff's motion for summary judgment is GRANTED.

    B.  Defendant's motion for summary judgment is DENIED.

2.  Regarding plaintiff's claim for breach of the duty to indemnify:

    A.  Plaintiff's motion for summary judgment is DENIED.

    B.  Defendant's motion for summary judgment is DENIED.

3.  Regarding plaintiff's claim for breach of the covenant of good faith and fair dealing, defendant's motion for summary judgment is DENIED.

IT IS SO ORDERED

DATED: February 12, 2008.

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE